600 S.E.2d 244

STATE of West Virginia ex rel. Darrell V. McGraw, Jr., Attorney General, Plaintiff Below, Appellee,

v.

NATIONAL FUELS CORPORATION, a Delaware Corporation, and Derek Fredette, Individually and as President and Chief Executive Officer of National Fuels Corporation, Defendants Below, Appellants.

No. 31190.

Supreme Court of Appeals of West Virginia.

Submitted: Jan. 14, 2004.

Filed: June 24, 2004.

Albright, J., dissented and filed opinion.

Darrell V. McGraw, Jr., Attorney General, Charlene Cooper Fulton, Senior Assistant Attorney General, Charleston, for Appellee.

Matthew A. Victor, Esq., Victor, Victor & Helgoe, Charleston, for Appellants.

PER CURIAM.

The operator of an illegal gasoline voucher scam appeals the lower court's grant of summary judgment against him, and in favor of the State, which requires the payment of restitution, attorney fees, and an injunction barring the operation of the scam in West Virginia. For reasons set forth below, we affirm the grant of summary judgment.

## I.

### FACTS

This appeal stems from a consumer protection action filed by the Attorney General

against National Fuels and Derek Fredette, who ran a "free gasoline" scam in several states. In this appeal we sometimes refer to the appellants jointly as Mr. Fredette. He claims that the lower court erred in granting summary judgment in favor of the Attorney General without proper notice to him and without giving him time to speak with an appointed guardian ad litem. Before discussing these specific allegations, we relate some background information.

Mr. Fredette was the president of National Fuels Corporation. During the late summer and early fall of 2000, National Fuels Corporation ("National Fuels") contacted several West Virginia car dealers and offered, at a steep discount, coupons or vouchers for a certain amount of gasoline. National Fuels explained in correspondence that car buyers could redeem the vouchers at almost any gas station. Once the dealers purchased the vouchers from National Fuels, the Dealers would then give the coupons to car buyers as an inducement to buy a car; the car buyers were then supposed to be reimbursed by National Fuels for gas they purchased.

National Fuels offered vouchers in several denominations, starting with vouchers purportedly worth $500 in gasoline, which a dealer could purchase for only $45, and continuing through $250 vouchers sold for only $25, and $20 vouchers sold for only $2.50. National Fuels had a ready answer for any dealer who questioned how this financial alchemy was possible; purportedly, several large gasoline companies shared in the expense of the program, most customers would not bother to use the vouchers, and those that did would generally stop requesting reimbursement after the first month or so.

The first part of this explanation proved false—there were no companies helping to pay for the program. The second part of the explanation was more accurate, due to a complex and cumbersome procedure for using the vouchers, which National Fuels apparently designed to be as frustrating as possible to consumers. The first step required consumers to mail the vouchers back to National Fuels, who would issue a so-called "registration number" or "activation number." Then a consumer would go to the gas station, buy gas with his or her own money, and save the receipt. He or she would then have to use the "registration number" to fill out a monthly report and return it, with receipts attached.

To further discourage those consumers diligent enough to get the "registration number," save receipts, and fill out reports, National Fuels required consumers to return the reports by registered mail, which cost a minimum of $7.50 for each mailing. National Fuels rarely responded to consumer requests for a "registration number." When National Fuels did correspond with consumers, it used envelopes apparently designed to look like "junk mail" with no return address for National Fuels, and often printed with a picture and information about missing children. National Fuels obtained this information from the National Center of Missing and Exploited Children without permission.

Within a month or two of purchasing the vouchers, the car dealers started receiving complaints from car buyers who were unable to get any reimbursement from National Fuels. Ultimately, seven West Virginia car dealers incurred a loss of $14,850 for the purchase of the scam vouchers, and an additional loss of $109,000 for honoring the requests of car buyers who had received the vouchers.

National Fuels was running the same scam in several other states, including Wyoming and Texas. In December 2000, prior to the actions taken against National Fuels by the West Virginia Attorney General, the U.S. Attorney for the District of Wyoming seized the assets in several bank accounts belonging to Mr. Fredette or National Fuels. On January 4, 2001, U.S. Marshals raided the National Fuels office in Florida, where they discovered a "boiler room" where employees who worked the phones had been instructed to converse with customers as though they were located in Seattle, Washington, instead of Florida. The Texas Attorney General, on January 18, 2001, also filed suit against National Fuels and Mr. Fredette to stop the scam in Texas and get restitution for Texas consumers.

On February 5, 2001, the West Virginia Attorney General (hereinafter "the State") filed a complaint and petition for preliminary injunction against National Fuels and Mr. Fredette in the Circuit Court of Kanawha County. The State sought temporary and permanent injunctive relief, consumer restitution, and civil penalties. The State served both National Fuels and Mr. Fredette through the West Virginia Secretary of State and the Kanawha County Circuit Clerk. Anticipating that service by these means might not provide adequate notice if the lower court decided to hold a hearing quickly, the State also mailed copies of the summons and complaint to both defendants on February 5, 2001.

The State mailed the summons and complaint for National Fuels to Harvard Business Services, the company's agent for service of process, in Lewis, Delaware. The return receipt showed that the agent accepted delivery of the summons and complaint on February 8, 2001, and that the agent received this formal service from the Secretary of State on February 9, 2001. The State mailed the summons and complaint for Mr. Fredette directly to his home in Odessa, Florida, but he refused to accept it on February 8, 2001. The next day he also refused the formal service of process mailed by the Circuit Clerk.

The State sought an expedited hearing for the preliminary injunction and the court set a hearing date of February 15, 2001. On February 7, the State mailed notice of this hearing to both defendants, again via certified mail. On February 9, the agent in Delaware received the notice of hearing, and on February 10, Mr. Fredette refused to accept the notice mailed to his home in Florida. Thus National Fuels received six days notice of the preliminary hearing, and Mr. Fredette himself had five days notice of the preliminary hearing.

Neither National Fuels nor Mr. Fredette appeared at the February 15 hearing, where the court heard testimony from several car dealers and a car buyer who had received a voucher. The State presented to the court the certified mail receipts showing what notice had been provided to the defendants. At the conclusion of the hearing, the court granted a preliminary injunction ordering Mr. Fredette and National Fuels to cease doing business in West Virginia. The court also ruled that the defendants had received adequate notice. The next day the court issued its formal order granting the preliminary injunction, which the State mailed to both defendants. Again, the agent for National Fuels accepted the order, and Mr. Fredette refused to accept his copy.

During the spring and summer of 2001, Wyoming, Texas, and the federal government all took additional action against National Fuels and Mr. Fredette, seizing over one million dollars worth of assets and indicting Mr. Fredette and several accomplices for wire fraud, mail fraud, and conspiracy to commit the same. Mr. Fredette was tried, convicted, and on October 24, 2001, sentenced to 84 months in prison, plus additional supervised release and over $700,000 in restitution.

On December 18, 2001, the West Virginia Attorney General made a motion for summary judgment and a motion to appoint a guardian ad litem, due to Mr. Fredette's incarceration. The lower court appointed a guardian ad litem for Mr. Fredette on March 1, 2002 and set a hearing date for the summary judgment motion for April 19, 2002 in an order that also stated, "unless another date is requested by counsel." Although the guardian ad litem had seven weeks to contact Mr. Fredette, the guardian ad litem was unable to contact him before the hearing. Although the guardian ad litem filed an answer on March 14, 2002, he never requested to reschedule the hearing date. Instead of asking for a continuance, the guardian ad litem appeared at the hearing and said he had been unable to contact Mr. Fredette, who was allegedly "in transit" within the prison system, and thus difficult to reach.

At the hearing on April 19, 2002 the court granted summary judgment for the State, enjoining National Fuels and Mr. Fredette from selling the gasoline voucher program in West Virginia until such time as they have paid to the State $124,250 (the face value of vouchers already sold), and paid reasonable attorney fees, expenses, and costs in the

amount of $10,937.94. It is this ruling that Mr. Fredette now appeals.

Because we find that the lower court did substantial justice in this matter and that any increase in the notice offered the defendants or any discussions between Mr. Fredette and his guardian ad litem would have had no impact upon the outcome of the case, we affirm the decision of the lower court.

## II.

## STANDARD OF REVIEW

As we have often explained: "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*." Syl. pt. 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996). This Court has also held that a circuit court has wide discretion in applying procedural rules. "[T]he West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making ... procedural rulings. As the drafters of the rules appear to recognize, ... procedural rulings, perhaps more than any others, must be made quickly, without unnecessary fear of reversal, and must be individualized to respond to the specific facts of each case.... Thus, absent a few exceptions, this Court will review all aspects of the circuit court's determinations under an abuse of discretion standard." *McDougal v. McCammon,* 193 W.Va. 229, 235, 455 S.E.2d 788, 794 (1995). Bearing these standards in mind, we turn to the case at hand.

## III.

## DISCUSSION

The primary argument advanced by Mr. Fredette is that the State has deprived him of due process by not giving him nine days notice of the first hearing, held February 15, 2001. He claims that the State violated Rule 6(d)(1)(A) of the West Virginia Rules of Civil Procedure by not giving him greater notice. Mr. Fredette makes this argument in spite of the fact that he received seven days actual notice that the State had filed suit against him, and five days notice of the hearing.

In response, the State argues that Mr. Fredette's argument ignores the provision of Rule 6(d) that permits a judge to hold a hearing sooner if necessary, fails to show, or even allege that he was prejudicially surprised by anything at the hearing, and that he fails to take into consideration the "practicalities and peculiarities of the case," which should be a part, the State claims, of any due process analysis. The rule states in pertinent part:

(1) Service; Motion. *Unless a different period is set by these rules or by the court,* a written motion (other than one which may be heard *ex parte* ), notice of the hearing on the motion, and any supporting brief or affidavits shall be served as follows:

(A) at least 9 days before the time set for the hearing, if served by mail, or

(B) at least 7 days before the time set for the hearing, if served by hand delivery or by fax to the opposing attorney, or if left with a person in charge at the opposing attorney's office, or in the event that the opposing party is not represented by counsel, then if served by hand delivery or by fax to the opposing party, or if left at the party's usual residence with a person capable of accepting service pursuant to Rule 4(d)(1)(B).

Rule 6(d), W. Va. R.Civ.P. (1998) (emphasis added).

As noted by the State, the specific terms of the statute allow a court to shorten the time periods. In this case, the court effected a *de facto* reduction of the notice period when, on February 7, 2001, the court scheduled a hearing for February 15, only eight days later. Thus the State could not possibly have given nine days notice by mail to Mr. Fredette, and could not give notice by fax or hand delivery to opposing counsel within seven days because Mr. Fredette did not yet have counsel in the West Virginia action.

While it is clear that a court may reduce the notice period set forth in Rule 6(d), the real question before this Court is whether the reduction in the notice period in

this case gives rise to an unconstitutional deprivation of due process. We believe it does not. This Court faced a related issue in *State ex rel. Ward v. Hill*, 200 W.Va. 270, 489 S.E.2d 24 (1997), a case involving whether or not defendants in a medical malpractice case could use the expert witnesses designated by another defendant who had settled. Several lawyers in the case received only 24 hours notice (or less) that the court was holding a hearing on the expert witness issue. After reviewing other, related cases, the Court in *Ward* ruled that, "we find that the circuit court abused its discretion in holding a hearing when the non-moving parties were given almost no notice and no time to prepare." *Id.*, 200 W.Va. at 276, 489 S.E.2d at 30.

However, the Court also explained that "[t]he purpose of the notice requirement of 'Rule 6(d) is to prevent a party from being prejudicially surprised....'" *Id.* (quoting *Daniel v. Stevens*, 183 W.Va. 95, 104, 394 S.E.2d 79, 88 (1990)). In *Ward*, the Court determined that one side had been prejudicially surprised by receiving less than one days notice. However, we do not believe this is true of the instant case.

We note that Mr. Fredette and National Fuels were in the business of defrauding car dealers and car buyers on a nationwide scale. In the two months immediately preceding the filing of the West Virginia action, the Texas Attorney General had sued National Fuels for consumer protection violations, the U.S. Attorney in Wyoming had filed two civil forfeiture cases alleging mail fraud, wire fraud, and money laundering and had seized $915,000 of ill-gotten assets, and the U.S. Marshals had raided the company headquarters in Holiday, Florida.

Mr. Fredette had enjoyed the assistance of counsel in the Texas case since at least December 1, 2000, and in the Wyoming case since at least December 29, 2000. Because all of Mr. Fredette's legal troubles stemmed from the gas voucher scam, the Texas complaint contained factual allegations, legal theories, and requests for relief that were virtually identical to those contained in the West Virginia complaint.

Clearly, Mr. Fredette was not having the best of luck at the time the West Virginia complaint was filed, and one could argue that he was distracted by the other actions and the specter of a federal prison sentence. However, to claim that a two day reduction in notice left Mr. Fredette "prejudicially surprised" strains credulity and puts the procedural cart before the horse. Thus, we reject Mr. Fredette's argument that he did not have adequate notice of the preliminary injunction hearing and affirm the decision of the lower court on this point.

Next, Mr. Fredette argues that the lower court erred when it granted summary judgment in favor of the State in spite of the fact that the guardian ad litem appeared and informed the court that he had not yet been able to contact Mr. Fredette. As we noted previously, at the time of the filing of the complaint, Mr. Fredette was a free man, but by March of 2002, he had been incarcerated by federal authorities. As a result, the lower court appointed a guardian ad litem for Mr. Fredette on March 1, 2002, and set a hearing date of April 19, 2002 for the State's motion for summary judgment, "unless an alternate date is requested by counsel."

The court presented the guardian ad litem with a difficult task—representing a client incarcerated in the federal prison system, in another state, who faced a host of legal problems in this State and others, and who was unlikely to be able to cooperate significantly in his own defense in the West Virginia action. Nevertheless, the guardian ad litem had seven weeks to either find Mr. Fredette and consult with him, or to notify the court that a continuance was desired. Unfortunately, neither outcome came to pass, and instead the guardian ad litem did not inform the court of his inability to speak with Mr. Fredette until the hearing of April 19, 2002. Instead of continuing the hearing at that point, which would have been a more desirable course, the lower court granted summary judgment against Mr. Fredette.

■ There are no doubt many other circumstances where this Court would find the lower court's actions to be reversible error, and we in no way wish to diminish the importance of meaningful communication between a guardian ad litem and his or her client,

where a client would be capable of such communication. However, under the limited circumstances of the instant case we do not believe the lower court's action should be reversed. This Court has stated, of lower court decisions:

> When the court, on a thorough examination of the whole case, finds that substantial justice has been done, the judgment will not be reversed for any error committed by the circuit court, unless such error, if it had not been committed, would have tended in some measure to produce a different result.

Syl. pt. 4, *Barnes v. City of Grafton*, 61 W.Va. 408, 56 S.E. 608 (1907); *accord, Maynard v. National Fire Ins. Co. of Hartford*, 147 W.Va. 539, 129 S.E.2d 443 (1963); *Ward v. Sams*, 182 W.Va. 735, 391 S.E.2d 748 (1990) (*per curiam*); *Town of Bancroft v. Turley*, 170 W.Va. 1, 287 S.E.2d 161 (1981)(*per curiam*).

 In the instant case, Mr. Fredette and National Fuels faced either civil actions or criminal prosecution in several jurisdictions for the gas voucher scam. The allegations made in the West Virginia complaint are synonymous with those made in other states. Mr. Fredette was convicted of wire fraud, mail fraud, and conspiracy in federal court for conducting the same scam in another state. While the guardian ad litem presented a blanket denial of all the allegations in the State's complaint, nothing in the record suggests that Mr. Fredette would have been able to present a meritorious defense to the complaint.[1]

The lower court made detailed findings of fact regarding the gasoline voucher scam and Mr. Fredette's role in it. The summary judgment order only requires Mr. Fredette to pay reasonable attorney fees and to pay restitution of the amounts the car dealers actually paid for the vouchers or had to pay to car buyers to make good on the vouchers. The order merely prohibits Mr. Fredette from engaging in the sale of similar vouchers in West Virginia only until such time as he is able to show he is operating a legitimate business enterprise.

We are hard pressed to find that any action taken by Mr. Fredette or his able counsel "would have tended in some measure to produce a different result." Because we find that the lower court judge achieved "substantial justice" in this case we reject Mr. Fredette's argument and affirm the decision of the lower court.

## IV.

### CONCLUSION

For the reasons stated, the order of the Circuit Court of Kanawha County is affirmed.

Affirmed.

Justices STARCHER and ALBRIGHT dissent and reserve the right to file dissenting opinions.

ALBRIGHT, Justice, dissenting.

This case concerns a motion for summary judgment for a permanent injunction where the trial court had previously granted an effective preliminary injunction. Subsequently, the trial court refused to delay the hearing for the permanent injunction so that an appointed guardian ad litem might have a better opportunity to confer with his ward, an inmate of the federal correctional system, who could not be reached at the time. The

---

1. One might also analyze the propriety of the order of summary judgement granted against Mr. Fredette in the same way one analyzes the propriety of a default judgment. An important component of default judgment analysis is whether or not the defaulting party could have presented a meritorious defense, in the absence of a default:

 > In determining whether a default judgment should be entered in the face of a Rule 6(b) motion or vacated upon a Rule 60(b) motion, the trial court should consider: (1) The degree of prejudice suffered by the plaintiff from the delay in answering; (2) *the presence of material*

*issues of fact and meritorious defenses;* (3) the significance of the interests at stake; and (4) the degree of intransigence on the part of the defaulting party.

Syl. pt. 3, *Parsons v. Consolidated Gas Supply Corporation*, 163 W.Va. 464, 256 S.E.2d 758 (1979)(emphasis added); *accord, Games–Neely v. Real Property*, 211 W.Va. 236, 565 S.E.2d 358 (2002); *Cales v. Wills*, 212 W.Va. 232, 569 S.E.2d 479 (2002). It appears from the record that Mr. Fredette had no meritorious defense to present to the court, nor does there appear to be a material issue of fact in dispute.

record indicates that the guardian ad litem could not reach his ward because the ward was being transferred from one federal correctional institution to another. A hearing on the summary judgment motion was held and summary judgment for the permanent injunction was entered, notwithstanding the inability of the guardian ad litem to contact and talk with his ward.

The majority opinion concludes that "the lower court judge achieved 'substantial justice' in this case." I am utterly unable to fathom how or why.

Even a scoundrel is entitled to notice and a fair opportunity to talk to his counsel or guardian ad litem. More importantly, the rush to judgment in this case was not necessary. A preliminary injunction was in place and delay of a day or two or even a week to search the bowels of the federal correctional system for the guardian ad litem's missing ward posed no threat whatever to the public interest or the orderly functioning of the judicial system. Most importantly, the carefully crafted rules of this Court permitting the substitution of a guardian ad litem for what was previously called a committee for an incarcerated person are made virtually meaningless by the cavalier disregard of those rules and implicit sanction of such cavalier treatment evidenced by the majority opinion.

Notice and opportunity to be heard are minimal standards of due process and fairness. The majority has redefined "substantial justice" to exclude these two bedrock principles.

Accordingly, I respectfully dissent. I am authorized to state that Justice Starcher joins in this dissent.